Argued and submitted September 3, 2015, reversed and remanded
February 23, 2017

Ryan L. ROADHOUSE,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT;
and Masu Sushi, Inc.,
*Respondents.*

Employment Appeals Board
2014EAB0947; A157520

391 P3d 887

Kirsten Rush argued the cause for petitioner. With her on the brief was Busse & Hunt.

Denise G. Fjordbeck waived appearance for respondent Employment Department.

No appearance for respondent Masu Sushi, Inc.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

**FLYNN, J.**

Claimant seeks review of a final order of the Employment Appeals Board denying him unemployment insurance benefits because it found that claimant "voluntarily left work without good cause." ORS 657.176(2)(c). The board based its determination that claimant voluntarily left work on its finding that claimant could have continued working for employer after he refused to attend a meeting that employer had scheduled for claimant's day off and at which claimant believed he would be fired. We review that order for "substantial evidence, substantial reason, and errors of law." *Franklin v. Employment Dept.*, 254 Or App 656, 657, 294 P3d 554 (2013). We conclude that the board's determination that claimant could have continued working for employer is not supported by substantial reason. We reverse and remand on that basis, without addressing the board's decision that claimant lacked "good cause" to quit.

## BACKGROUND

We summarize the facts from the board's findings and from the undisputed evidence in the record that is not inconsistent with those findings. Claimant had been employed as head chef at employer's restaurant for almost four years when, just before the weekend of Valentine's Day, a coworker told claimant that employer's owner[1] had arranged a secret meeting with another coworker to discuss firing claimant. Claimant did not ask further questions about the meeting because it was just a "rumor" and because he needed to get the restaurant through the busy weekend. However, claimant expected to be "let go" after he finished his work on Sunday. Claimant testified that his belief was reinforced when he noticed that employer changed the locks to the restaurant's doors on Sunday and saw employer give out a new key to one of the employees. Employer left the restaurant Sunday evening before claimant finished his work and without giving claimant a key.

Claimant left the restaurant at about 11:15 p.m. on Sunday and, at approximately 11:45 p.m., received a text

---

[1] The board uses the terms "owner" and "employer" interchangeably to refer to the individual owner whose actions are described in this opinion. We will use the term "employer" throughout this opinion.

message from employer asking to meet with claimant the next morning, February 17, at 9:30 a.m. Although claimant was not scheduled to work again until February 19, claimant sometimes came into the restaurant on his days off to do inventory. He responded to the message and asked to meet at 10:00 a.m. instead of 9:30 a.m. Employer responded, "[O]kay see you then."

After scheduling the meeting, claimant questioned the coworker who reportedly had attended the secret meeting with employer and was told that employer had asked if the coworker "could take over [claimant's] ordering duties" and had said that claimant was being "fired" because employer "can't afford [claimant's] salary anymore." Claimant then sent a text message to employer that stated:

"So I hear [you are] firing me. That is fine. Just mail me my check. Do you need my address?"

Employer never responded to that message.

Claimant did not attend the meeting on February 17. Instead, he sent employer an email at 10:05 a.m. that morning explaining his response to what he understood to be employer's plan:

"I have learned of my dismissal from my subordinates and received a similar confirmation from your wife. It is unfortunate to receive this information in such an unprofessional and humiliating Manner. My subordinate cited [the restaurant's] financial inability to continue to pay my salary as the reason for my termination, which was also confirmed by your wife. Naturally, I will not be attending a dismissal meeting (falling on my day off at a business I am no longer employed with) clearly designed to further humiliate. Please do forward my final check expeditiously to: [claimant's address]"

Employer never responded to claimant's email, and claimant did not show up for his next scheduled work shift on February 19.

Shortly after February 19, claimant received his final check, which was dated February 16—the Sunday that he last worked. Employer testified that there was no significance to this date other than that it was "in the realm of the

area when [claimant] asked for his check." The check was handwritten, as opposed to being issued through employer's payroll company, because that was what employer did "in circumstances of quitting or firing." During the hearing, claimant confirmed that he would have been willing to continue working for employer had he not believed that he was being terminated.

Employer testified at the hearing that he did not disagree with claimant's description of events but that the coworker had misunderstood employer's intentions. Employer testified that he told the coworker he was going to propose some changes to claimant and wanted to get the coworker's opinion on whether the restaurant could continue operations without claimant if claimant "acted negatively" in response to the changes that employer wanted to make. When claimant did not show up for the meeting or his next scheduled shift, employer "figured [claimant] quit or he didn't want to be there anymore."

Employer acknowledged that when he received claimant's text and email message expressing the belief that he was being discharged, employer "didn't dispute it." When asked why he didn't respond to claimant's text or email if it was not his intention to discharge claimant, employer responded that, "Well it could have been the end result of the meeting. I'm not saying it wasn't a possibility. However—I mean I should have responded."[2] The ALJ found that claimant's belief that the purpose of the meeting was to tell him that he was going to be discharged was "entirely understandable," but ultimately concluded that claimant "voluntarily quit work" and did not have good cause to do so.

On review, the board found that "[c]laimant believed the owner planned to discharge him" at the meeting, based in part "on the owner's actions." However, the board found,

_____

[2] The ALJ found that employer "was prepared to discharge claimant" based on "financial difficulties" and dissatisfaction "with claimant's performance" in a variety of areas and had

"determined that if claimant could not change the methods by which he operated, he would be reduced from a salaried employee to an hourly employee. If claimant was unwilling to be reduced to an hourly employee or improve his performance, employer was prepared to discharge claimant."

"based on the owner's firsthand, sworn testimony" that employer "had not yet decided before" the scheduled meeting that employer would discharge claimant at the meeting. Based on that testimony from employer, the board determined that claimant could have continued working for employer and, thus, concluded that claimant voluntarily left work. The board also determined that claimant left without good cause.

## DISCUSSION

On judicial review, claimant argues that the board's conclusions are not supported by substantial evidence and are not "rationally related" to the board's findings of fact. With respect to the board's determination that claimant voluntarily quit, claimant contends that the board erred in relying entirely on the employer's subjective plan—prior to the time of the scheduled meeting—without considering employer's actions at the time of the scheduled meeting. Alternatively, claimant argues, his reasonable belief that he was being discharged provided good cause to leave work. We conclude that the board's determination that claimant could have continued working for employer is not supported by substantial reason and we reverse and remand on that basis.

We begin with some general context for the dispute in this case. The threshold question in determining eligibility for unemployment benefits is whether the separation from employment occurred because the employee was discharged or because the employee voluntarily left work; "[a]fter that question is resolved, the claimant's entitlement to benefits depends on the reason for the discharge or voluntary quit[.]" *Reynolds v. Employment Dept.*, 243 Or App 88, 90, 259 P3d 50 (2011). An employee is disqualified from receiving unemployment benefits if the employee has been "discharged for misconduct connected with work" or has "voluntarily left work without good cause." ORS 657.176(2)(a), (c). The answer to the threshold question of whether an employee has "voluntarily left work" or been discharged is a legal conclusion that is based on factual findings. *Van Rijn v. Employment Dept.*, 237 Or App 39, 41, 238 P3d 419 (2010).

In general, the distinction between voluntarily leaving work and discharge is described in OAR 471-030-0038(2): An employee is "discharged" "[i]f the employee is willing to continue to work for the same employer for an additional period of time but is not allowed to do so by the employer." OAR 471-030-0038(2)(b). Conversely, "If the employee could have continued to work for the same employer for an additional period of time the separation is a voluntarily leaving of work." OAR 471-030-0038 (2)(a). The dearth of appellate opinions analyzing that threshold question suggests that the rule eliminates most disputes. Yet, as this case illustrates, some circumstances are not fully resolved by the language of the rule.

A few of our cases suggest some additional, general propositions regarding the distinction between a discharge and a quit. First, our decision in *Reynolds* illustrates that an employee who resigns to avoid discharge may still have been discharged, if there is no evidence that the employee could have continued working. In *Reynolds*, the claimant resigned from her job after the employer told her that she would be discharged if she did not resign. The board determined that claimant could have continued working, because the employer did not say that the employee would be discharged "immediately" and because the employer had a progressive discipline policy under which "perhaps" the claimant would not have been discharged. 243 Or App at 91. We reversed and remanded, however, because there was no evidence that the claimant could have used the discipline policy to delay or avoid the impending discharge through the discipline policy. *Id.* at 92.

On the other hand, an employee's mere belief that the employer will discharge him does not make his resignation a discharge. *Sen v. Employment Dept.*, 218 Or App 629, 634, 180 P3d 95 (2008). In *Sen*, the claimant had been given a "written warning" about his behavior and was then offered money in exchange for a voluntary resignation. *Id.* at 631-32. The claimant believed that he would be discharged if he did not accept the offer, and he resigned. *Id.* at 632. The board found, however, that the claimant quit work without good cause, and we affirmed. In affirming the board's

conclusion that the claimant could have continued working for the employer, we emphasized that the record contained numerous facts suggesting that the claimant could have continued working after the date of his resignation and that even the claimant believed that he could have continued working beyond the date on which he resigned. *Id.* at 634.

Next, our decision in *Van Rijn* illustrates that an employer can communicate that an employee will not be allowed to return to work without explicitly using those words. In *Van Rijn*, we reversed the board's determination that the claimant voluntarily left work when the claimant left believing that he had been fired after he arrived three minutes late to work and his supervisor told the claimant, "I guess you just can't make it to work on time" and to "fucking leave." 237 Or App at 41. We concluded that nothing in the supervisor's comment "would support a finding that claimant was welcome to remain at or return to work" for the employer. *Id.* at 43.

With those illustrations in mind, we conclude that employer's actions at the time of the meeting could support a finding that claimant would not have been allowed to continue working and, thus, support a conclusion that he was discharged. The board's determination that claimant could have continued working for employer relies entirely on employer's testimony that—prior to the time of the meeting— he had not yet decided whether he would discharge claimant or allow him to continue working. However, employer's plan going into the meeting is not dispositive of whether claimant could have continued working for employer when he was next scheduled to do so. The board did not consider whether employer's actions at the time of the scheduled meeting demonstrate that claimant, ultimately, could not have continued working. That failure deprives the board's decision of substantial reason.

We are directed to set aside or remand the order if "the order is not supported by substantial evidence in the record." ORS 183.482(8)(c). Implicit in the requirement that the order be supported by substantial evidence is a requirement that the agency's findings and conclusions be supported by "substantial reason." *Jenkins v. Board of Parole,*

356 Or 186, 195, 197, 335 P3d 828 (2014) (describing holding of *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980)). *See also Campbell v. Employment Dept.*, 245 Or App 573, 579, 263 P3d 1122 (2011) (The substantial evidence standard of ORS 183.482(8)(c) "requires that the board's findings of fact be supported by substantial evidence and that its conclusions be supported by substantial reason, *i.e.*, its conclusions must reasonably follow from the facts found." (Internal quotation marks omitted.)).

As we recently emphasized regarding the substantial reason requirement, "[i]t is essential that an agency articulate in a contested case the rational connection between the facts and the legal conclusion it draws from them." *Genova v. Veterinary Medical Examining Board*, 282 Or App 234, 240, 386 P3d 40 (2016) (internal quotation marks omitted). In *Genova,* we determined that the agency's order lacked substantial reason because it "failed to adequately address why it rejected" a key argument from the petitioner. *Id.* at 240.

For reasons similar to those that we articulated in *Genova,* we conclude that the board's order lacks substantial reason. In determining that claimant could have continued working for employer, the board relied entirely on employer's testimony that—before the meeting—he thought that, perhaps, that would be the outcome of the meeting. Yet any decision that employer made at the time of the scheduled meeting regarding whether claimant would be allowed to continue working is at least as relevant as employer's intention prior to the meeting. Here, the evidence and the board's own findings regarding that evidence suggest that employer made a decision at the time of the scheduled meeting that claimant would not be allowed to continue working.

Specifically, the board found that employer engaged in conduct that caused claimant to believe that he would not be allowed to continue working after the meeting. The board also found that claimant advised employer of that belief in a text and email message. Employer admitted that he saw those messages and chose not to correct claimant's belief that he was being discharged. Instead, employer sent a final paycheck in a handwritten format that he reserved for employees who would not be continuing to work. Moreover,

the board found that employer had been communicating with claimant through text messages late the night before, and employer offered no explanation for allowing claimant to continue believing that he was being discharged, apart from a decision to confirm that belief. Indeed, employer's testimony suggests that he may have ignored claimant's message for precisely that reason—that he "didn't dispute" claimant's belief that he was "terminated," because that "could have been the end result of the meeting," anyway. The board failed to articulate a rational connection between those facts and its determination that claimant could have continued working when next scheduled to do so.

Reversed and remanded.