Argued and submitted August 7, 2018, affirmed May 13, petition for review
denied September 17, 2020 (367 Or 75)

Shelly KERR, Ph.D.,
*Petitioner,*

*v.*

BOARD OF PSYCHOLOGIST EXAMINERS,
*Respondent.*

Board of Psychologist Examiners
201510; A162841

467 P3d 754

Petitioner, a psychologist in charge of a university's counseling center, delivered a student's patient file to university attorneys who had received a litigation-hold letter from the student's attorney asking them to preserve the university's records related to the student's prospective claim against the university for sexual assault. Petitioner appeals an order of the Board of Psychologist Examiners (board) concluding that she violated ethics standards in disclosing the patient file without the student's consent. Petitioner argues that the board erred in (1) concluding that the records were confidential, because (a) the litigation-hold letter gave consent to disclosure, (b) the letter required petitioner to deliver the records to the university's attorneys, and (c) the student waived confidentiality by disclosing some of the patient file in prelitigation mediation; (2) determining that she failed to comply with the ethics standards requiring a psychologist to raise and attempt to resolve confidentiality concerns; (3) disregarding a witness's opinion; and (4) rejecting her claim that the proceedings' fairness was materially impaired when a board investigator gave information about the proceedings' interim status to an investigation witness. *Held*: The board did not err in rejecting petitioner's arguments that the patient file was not confidential when delivered. The litigation-hold letter did not express consent to disclosure of the patient file, nor require, as a matter of law, its delivery to the university's attorney. The student's use of a portion of the patient file in confidential mediation did not waive confidentiality. The board had substantial evidence to find that petitioner failed to raise the issue of confidentiality and attempt to resolve it as required by ethics rules when delivering the patient file to university attorneys. The board did not act contrary to law or substantial reason by giving no weight to the witness's testimony. Petitioner had not shown a procedural error materially impairing the fairness of the proceeding or the correctness of the order.

Affirmed.

C. Robert Steringer argued the cause for petitioner.
Also on the briefs was Bryson Davis, Harrang Long Gary
Rudnick, P. C.

Denise G. Fjordbeck argued the cause for respondent.
On the brief were Ellen F. Rosenblum, Attorney General,

Benjamin Gutman, Solicitor General, and Cecil A. Reniche-Smith, Assistant Attorney General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

DeVORE, J.

Affirmed.

_____

* DeVore, J., *vice* Hadlock, J. pro tempore.

## DeVORE, J.

This case poses questions about a psychologist's professional responsibility to protect confidentiality of patient records. Petitioner, a psychologist in charge of a university's counseling center, delivered a student's patient file to university attorneys who had received a litigation-hold letter from the student's attorney asking them to preserve the university's records related to the student's prospective claim against the university regarding a sexual assault off campus. Petitioner seeks judicial review of an order of the Board of Psychologist Examiners (board). The board concluded that, in delivering the patient file without consent, petitioner violated ethics standards and should be sanctioned with a reprimand and a civil penalty of $2,500.

As her first and second assignments of error, petitioner urges a single conclusion: that the board legally erred in concluding that she violated ethics standards, because the patient records were not confidential when delivered to the university's attorneys. She argues that is so because (a) the litigation-hold letter expressed the student's consent to disclosure; (b) the letter required petitioner to deliver the records to the university's attorneys as a matter of law; or (c) the student waived confidentiality when her attorney disclosed some of the patient's records to the university's attorneys in mediation. As her third assignment, petitioner argues that the board lacked substantial evidence to find that petitioner did not comply with the ethics standards calling for a psychologist to raise and attempt to resolve concerns about confidentiality. In her fourth assignment, petitioner argues that the board acted contrary to law and substantial reason when disregarding the opinion of a witness who, if he had been asked, would have advised petitioner to do as she did. In her fifth assignment, petitioner argues that the fairness of the proceedings was materially impaired when a board investigator gave information about the status of proceedings to the student's counselor, a witness in the investigation.

As to the first and second assignments of error, we conclude that the board did not err in rejecting petitioner's arguments about the confidentiality of the patient file. The

litigation-hold letter did not express consent to disclosure as ethics standards require; it did not serve as a legal exception to petitioner's duty of confidentiality so as to require disclosure; and the student did not waive confidentiality when her attorney disclosed some of the records during mediation. As to the third assignment, we conclude that the board had substantial evidence to determine that petitioner failed to raise the issue of confidentiality and attempt to resolve it as required by ethics standards. Fourth, we conclude that the board did not act contrary to law or substantial reason by giving no weight to a lawyer-witness's testimony about what he would have advised petitioner. Fifth, we conclude that petitioner has not shown a procedural error materially impairing the fairness of the proceeding or the correctness of the order resulting from procedural information disclosed to a witness during the investigation. For the reasons that follow, we affirm.

On questions of law, we review the board's order for legal error. ORS 183.482(8)(a). Where the question of law is the board's interpretation of its own rule or its ethics standards, as here, there is no error of law if the board's plausible interpretation of its own rule or standard cannot be shown either to be inconsistent with the wording of the rule itself, with the rule's context, or with any other source of law. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). On questions of fact, we review the order to determine whether it is supported by substantial evidence in the record. ORS 183.482(8)(c). In doing so, "we do not substitute [our] judgment for that of the agency as to any issue of fact or agency discretion." *Osuna-Bonilla v. Teacher Standards and Practices Comm.*, 282 Or App 260, 261, 386 P3d 229 (2016) (internal quotation marks omitted). "Implicit in the requirement that the order be supported by substantial evidence is a requirement that the agency's findings and conclusions be supported by 'substantial reason.'" *Roadhouse v. Employment Dept.*, 283 Or App 859, 865-66, 391 P3d 887 (2017) (citing *Jenkins v. Board of Parole*, 356 Or 186, 195, 197, 335 P3d 828 (2014)).

Much but not all of the facts are undisputed. Where disputed, we note the dispute and accept the facts found by the board that are supported by substantial evidence in the record.

## I.  FACTS

Petitioner is a licensed psychologist, the director of the Counseling and Testing Center (Center), and the records custodian for the Center. In March 2014, a university student reported to police that she had been sexually assaulted at a party by three men who were then members of the university's basketball team. She sought mental health counseling at the Center.

The student signed an informed-consent form, which, in part, promised that "[i]nformation you share with your counselor is considered confidential and generally cannot be released to persons or institutions outside of the [Center] without your written permission." The Center's policy on confidential records provided, in part:

> "Confidential information is generally disclosed only after the client has signed the Authorization for Exchange of Information or similar release form. Oral consent shall suffice when the need for disclosure prior to receiving signed release is considered essential. In such cases, written consent is obtained as soon after release as possible."

The Center's policy on disclosure added that decisions to release confidential information are made in a manner consistent with Oregon law on psychotherapist-patient privilege, the university's student records policy, and the American Psychological Association Code of Ethics.

In May, the student began counseling sessions at the Center with counselor Morlok to help the student cope with trauma from the sexual assault. Morlok took the student's mental health history, made a mental health diagnosis, and developed a treatment plan.

The student hired attorney Clune to bring potential legal action against the university for liability arising out of the alleged sexual assault. In May 2014, she signed a release giving the Center permission to provide information to her attorney.

On August 5, 2014, Clune wrote a letter to Park, the interim general counsel for the university. In the letter, Clune advised that the university had a "duty to preserve all potentially relevant documents and electronically stored

information (ESI) in anticipation of litigation in this matter." The potential litigation concerned civil rights claims and claims for sexual assault, harassment, discrimination, and retaliation. Clune asserted that the duty to preserve documents involves all documents created by so-called "key players," as the term was used in a federal decision from another jurisdiction.[1] Clune wrote:

> "Moreover, we expect that you, in your role as University Counsel, will take the steps required by the *Zubulake* cases to ensure that all potentially relevant evidence is preserved. Accordingly, you must immediately issue a 'litigation hold' regarding this matter to all University employees."

Clune urged that routine document destruction be suspended concerning the matter. He added:

> "Lastly, you must instruct all University employees, including the 'key players,' to produce electronic copies of their relevant active files, and make sure that all back-up materials are identified and stored in a safe place."

He warned that, if potentially relevant evidence is lost, he would seek sanctions against the university in the prospective litigation. Clune included a sample memo to be sent to employees.

On August 22, 2014, another attorney in Park's office sent a memo to a number of university employees to advise that litigation related to the sexual assault was anticipated and that employees should preserve documents potentially concerning the matter. She cautioned that documents should be preserved even if scheduled for routine deletion. Petitioner was among the employees to whom the memo was addressed.

On the same day, August 22, 2014, Clune wrote the university's attorneys, notifying the university that the student's claim would include damages based on future mental health treatment, medical expenses, emotional distress, and impaired career income due to post-traumatic stress

---

[1] Clune referred to *Zubulake v. UBS Warburg LLC*, 220 FRD 212, 217-18 (SDNY 2003) (*Zubulake IV*). The term "key players" is used to refer to the people identified in a party's "initial disclosure" required under FRCP 26(1)(a)(A) because they are "employees likely to have relevant information." *Zubulake v. UBS Warburg LLC*, 229 FRD 422, 433-34 (SDNY 2004) (*Zubulake V*).

disorder. He followed the letter with a tort claim notice in September.

In November, Clune asked counselor Morlok for information about his client, the student. Petitioner told Morlok that a request should go through the General Counsel's Office. However, Morlok told the student that she could simply sign a release seeking documents for her own purposes, and the student did that. On November 18, 2014, the Center duplicated the student's counseling records, and she picked them up that day.

On November 21, 2014, the student and the university engaged in a mediation to explore settlement of her prospective legal action. Clune selected some of the student's patient records and tendered them to the university's counsel in support of the claim for damages. In doing so, he cautioned, "I would ask that you not secure your own copy of the complete file today just out of respect for the [student]." The mediation failed.

On December 8, 2014, an attorney from the General Counsel's Office emailed petitioner to request that the Center provide a complete copy of its patient file on the student. In response, petitioner directed a member of her staff to duplicate the file, to not stamp it because "it is going to general counsel," and to place it in her mailbox for review.[2] The staff member did not follow directions because there was no form from the student to release the file. The next day, however, another staff member followed petitioner's instructions and copied the file that contained all of the student's confidential mental health records.

On that day, December 9, 2014, petitioner called Park about the patient file. She knew Park as one of the attorneys who had advised the Center, as he did with other university departments or services. In recounting the call, petitioner later testified that she was relying on Park "for legal interpretation" and for an understanding of Clune's letter, but she did not "rely on him to interpret the ethics code for [her]." She said that she was "attempting to get information from him about the legalities and from

---

[2] The normal process is to stamp copies made of records.

there \*\*\* it was [her] responsibility to determine whether or not those expectations complied with the ethics codes." She recalled that Park said that Clune's litigation-hold letter spoke of a need to preserve records, "for parties to produce records," and warned of potential implications for not doing so. She recalled that she had discussed that, in previous litigation, "the expectation" had been to "hold and preserve in place" at the Center. She said, however, "in this particular instance, the records needed to be produced to the office of general counsel." Because the student's attorneys had already provided Park with some of the records, petitioner asked if it would be sufficient if Park simply got those records from her attorneys rather than the Center. Petitioner testified that she did advocate on behalf of the student's confidentiality, but, when pressed for specifics, she allowed that she "did not explicitly say to [attorney] Park I have a serious ethical concern about what you're asking me to do."[3]

Park also testified about their conversation. He said that he was serving as interim general counsel, managing all litigation with the university. He told petitioner that he needed the records to comply with the litigation-hold request to ensure that they were properly secured. He said that they were potentially relevant because he had seen some of them in mediation. He recalled that petitioner asked, because he had seen a copy, why he needed a copy from the Center. She had said that the student's lawyers "already have a copy obviously." Park explained that the university had a "duty to maintain the documents" to avoid court penalties.[4] Park recalled that he knew from past conversations on other matters that petitioner had confidentiality concerns, so he "preempted" that discussion by telling petitioner that she was sending the student file for preservation purposes. He testified that he said to petitioner, "[Y]our sending those documents to us for preservation purposes is allowed under your ethical rules." He told her that "it's not sufficient for

---

[3] In hindsight, petitioner testified that she would have liked to have contacted the student directly to tell her what was being asked and to do whatever the student thought was best.

[4] Park testified that he had no reason to believe that the records were not being properly retained at the Center.

you just to keep them down there." Park believed that the litigation-hold letter directed that files be produced to the university's attorneys. Also, he told petitioner that the student had waived confidentiality when her attorney shared some of the patient records during mediation. When pressed on cross-examination, Park testified that he could not recall that petitioner mentioned her ethics standards or that his request was causing her ethical problems.

On the next day, December 10, 2014, petitioner hand-delivered the student's patient records to the university's attorneys. The records were scanned to a computer server and the paper copies were locked in a cabinet. The university later represented that no one in the office ever actually reviewed the records.

Upon learning of the file's delivery, the student wrote to the board expressing her objection to the release of her patient records and stressing that she had not given consent for release of the file to the university's attorneys. In January 2015, the student filed an action against the university, alleging claims related to the sexual assault and the disclosure of her patient records. That action was dismissed in August 2015 pursuant to a settlement.

## II.   PROCEEDINGS

A.   *The Board's Proceedings*

In September 2015, the board issued a notice of proposed disciplinary action to petitioner. Petitioner requested a hearing. In that hearing, an administrative law judge (ALJ) received documentary evidence and heard witness testimony. We discuss some of the testimony later in more detail when relevant to particular issues. After making findings, the ALJ concluded that petitioner had breached the standards of confidentiality governing psychologists. Petitioner sought review before the board. The board accepted the ALJ's recommended decision, and petitioner sought reconsideration. Upon reconsideration, the board supplemented its final order but adhered to its findings and conclusions. We summarize that order because it is the basis for petitioner's challenges.

B.  *The Board's Order*

        The board began by describing the standards
that govern. The board is authorized to sanction by ORS
675.070(1) (2015), which, among other things, authorizes the
board to suspend a license, issue a letter of reprimand, or
impose a civil penalty.[5] Under ORS 675.070(2)(d)(A) (2015),
grounds for sanction exist when a person is guilty of unpro-
fessional conduct in the practice of psychology contrary to
recognized standards of ethics of the profession.[6] Similarly,
grounds for sanction exist under ORS 675.070(2)(h) (2015)
and ORS 675.110(12) (2015) if a person has violated "a pro-
vision of the code of professional conduct" adopted by the
board. The board has adopted the American Psychological
Association's (APA) *Ethical Principles of Psychologists and
Code of Conduct* (2017) (Ethics Code).[7] OAR 858-010-0075.

---

[5]  In part, ORS 675.070(1) (2015) provides:

    "If any of the grounds enumerated in subsection (2) of this section exist,
the State Board of Psychologist Examiners may impose any of the following
sanctions:

    "* * * * *

    "(c)  Suspend the license of any psychologist or psychologist associate for
a period of not less than one year;

    "(d)  Issue a letter of reprimand;

    "* * * * *

    "(g)  Impose a civil penalty as described in subsection (3) of this section
[an amount not to exceed $5,000]."

ORS 675.070 has seen several amendments since 2015. We refer to the 2015
version throughout this opinion.

[6]  In relevant part, ORS 675.070(2) (2015) provides:

    "The board may impose a sanction listed in subsection (1) of this section
against any psychologist or psychologist associate or applicant, or, if appli-
cable, any unlicensed person found in violation of ORS 675.010 to 675.150,
when, in the judgment of the board, the person:

    "* * * * *

    "(d)  Is guilty of immoral or unprofessional conduct or of gross negligence
in the practice of psychology, including but not limited to:

    "(A)  Any conduct or practice contrary to recognized standard of ethics of
the psychological profession or conduct or practice that constitutes a danger
to the health or safety of a patient or the public, or any conduct, practice or
a condition that adversely affects a psychologist or psychologist associate's
ability to practice psychology safely and skillfully."

[7]  The APA revised the Ethics Code in 2016, but none of those amendments
pertain to provisions relevant to this case. Accordingly, we cite to the APA's most
recent version of the Ethics Code from 2017.

That code provides the standards that petitioner is accused of having violated, as well as the potential legal exception on which petitioner relies.

The first of two parallel requirements tell a psychologist how to approach conflicts between ethical responsibilities and either the requirements of law or the demands of an employer. When a requirement of law presents the problem, Ethics Code Standard 1.02 provides:

> "If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the \* \* \* Ethics Code."

When an employer presents the problem, Standard 1.03 provides:

> "If the demands of an organization with which psychologists are affiliated or for whom they are working are in conflict with this Ethics Code, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with \* \* \* the Ethics Code."

The next of two related requirements speak to the duty of confidentiality itself. Standard 4.01 provides:

> "Psychologists have a primary obligation and take reasonable precautions to protect confidential information obtained through or stored in any medium, *recognizing that the extent and limits of confidentiality may be regulated by law* or established by institutional rules or professional or scientific relationship."

(Emphasis added.) The related provision on disclosure speaks of consent or exceptions in law. Standard 4.05 provides:

> "(a) Psychologists may disclose confidential information with the appropriate consent of the organizational client, the individual client/patient, or another legally authorized person on behalf of the client/patient unless prohibited by law.

> "(b) Psychologists disclose confidential information without the consent of the individual *only as mandated by*

*law*, or where permitted by law for a valid purpose such as to (1) provide needed professional services; (2) obtain appropriate professional consultations; (3) protect the client/patient, psychologist, or others from harm; or (4) obtain payment for services from a client/patient, in which instance disclosure is limited to the minimum that is necessary to achieve the purpose."

(Emphasis added.) The term "reasonable," which appears in the first three standards, is not left to conjecture or common usage. The introduction to the Ethics Code explains:

"As used in this Ethics Code, the term reasonable means the prevailing professional judgment of psychologists engaged in similar activities in similar circumstances, given the knowledge the psychologist had or should have had at the time."

The introduction also posits the possibility that ethical standards may set higher standards than the law. That is to say, law is not in every case necessarily an exception. The introduction advises:

"If this Ethics Code establishes a higher standard of conduct than is required by law, psychologists must meet the higher ethical standard. If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to this Ethics Code and take steps to resolve the conflict in a responsible manner in keeping with basic principles of human rights."

On that point, the introduction echoes the language of Standards 1.02 and 1.03.

After reciting those standards, the board rejected petitioner's preliminary defenses of consent and waiver, concluding therefore that the patient file remained confidential.[8] The board disagreed that the litigation-hold letter required petitioner to deliver the patient file to the university's attorneys. Observing that the litigation-hold letter did

---

[8]  The board also rejected petitioner's alternative arguments that the patient records were ordinary "education records," thus entitling the university attorneys to have them as "school officials" with a "legitimate educational interest in the records" within the meaning of the Family Educational Rights and Privacy Act (FERPA), 20 USC § 1232g (2013), and the definition of "education records" under 34 CFR § 99.3 (2012).

not specifically address Center records, the board declared that the letter did not provide consent to the release of those records. Whatever the preservation letter might have meant when generally directed at university records, the board concluded it was not the kind of express consent for disclosure required by Standard 4.05(a). Similarly, the board rejected the argument that the student's lawyer had waived confidentiality. Because the patient file remained confidential, the board proceeded to apply the ethical standards.

The board observed that a psychologist has a primary duty to protect confidential information and to disclose it only with client consent. Standard 4.01; Standard 4.05(a). The board added that even some disclosure permitted by law may raise ethical concerns. In light of Standards 1.02 and 1.03, the board concluded that petitioner had a duty to clarify the nature of the conflict, make known her commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the Ethics Code. As a matter of fact, the board determined that petitioner did not expressly advise Park that she had ethical concerns nor communicate her commitment to the Ethics Code.

In light of Standards 4.01 and 4.05, the board concluded that petitioner should have done more; that she knew the student had not given a written release of her patient file; that she should have contacted the student to obtain consent; and that she should have sought independent advice, rather than rely on the advice of an attorney she knew to be defending the university, whose legal interests could potentially differ from her ethical responsibilities. In reaching those conclusions, the board weighed the differing testimony of the board's ethics expert, Dr. Younggren, petitioner's ethics expert, Dr. Thomas, and lawyer-witness Cooney, who regularly represents psychologists in disciplinary proceedings before the board. The board agreed with Younggren that petitioner should have secured the student's consent, insisted on a "clear directive from General Counsel to release the records," or demanded a court order compelling disclosure.

The board concluded that petitioner acted contrary to the standards of the profession by delivering the patient

file to the attorneys defending the university. The board issued an order reprimanding petitioner and ordering her to complete six hours of professional education in ethics and pay a civil penalty of $2,500.

## III.   JUDICIAL REVIEW

### A.   *Issues Not Raised*

Petitioner now seeks judicial review. Before we address the many issues presented, it is helpful to distinguish the issues that are not presented on review. The parties have proceeded on the common understanding that petitioner's delivery of the patient file to the university's attorneys was delivery to attorneys acting to defend the university from a prospective legal action. Although the university's attorneys also served as counsel for the Center, as it did for other university entities, petitioner does not contend that the university's attorneys were synonymous with the Center as alter egos of the Center for record-keeping. Although the file reportedly was not reviewed by the attorneys, the board and the parties assume that delivery of the patient file was a disclosure to persons outside the Center—a disclosure that must be justified or excused under the Ethics Code.

Next, petitioner has not contended that her delivery of the file to the university's attorneys is reasonable or excused on the grounds that she received advice from the university's attorneys that was mistaken or given without an appropriate warning of a need for independent ethics advice. That is to say, petitioner does not assert reliance on faulty advice as a good faith defense or as mitigation of an ethical violation. Instead, petitioner embraces that advice and contends that the advice was correct.

Finally, petitioner does not contend that the board abused its discretion in imposing the sanctions, or the measure of sanctions, for the violations it found. Instead, petitioner contends that the board erred in determining that her conduct violated ethical standards. With those distinctions made, we address the issues presented in turn.

### B.   *Confidential Patient File*

In her first and second assignments of error, petitioner contends that the board legally erred in concluding

that she violated Standards 1.02, 1.03, 4.01, and 4.05, because the patient file was not confidential at the time when petitioner delivered it to the university attorneys.

There is no dispute that, at the outset, the student's patient records were confidential within the meaning of the Ethics Code, the informed consent form that the student had signed, the Center's policy on confidential records, and the psychotherapist-patient privilege, which is referenced in Center policy. *See* OEC 504 (providing evidentiary privilege).[9] Ethics Code Standard 4.05 provides that psychologists may disclose confidential information "with the appropriate consent" of the patient and that a psychologist may disclose confidential information without consent "only as mandated by law" or in emergency or other circumstances not applicable here. The Center policy specified that "[c]onfidential information is generally disclosed only after the client has signed the Authorization for Exchange of Information or similar release form." Although the student had signed a release to allow the Center to release the file to her, she had not signed a release for delivery of her file to the university attorneys.

Petitioner contends that the patient file did not remain confidential. In support of that contention, she reiterates the several arguments she made to the board.[10]

1. *Consent to disclosure?*

Petitioner argues that the litigation-hold letter from the student's attorney expressed the consent necessary for

_____

[9]  In part, OEC 504 provides:

"(1) As used in this section, unless the context requires otherwise:

"(a) 'Confidential communication' means a communication not intended to be disclosed to third persons ***.

"*****

"(2) A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

[10]  She also argued that the student's receipt of her patient records eliminated their status as treatment records and made them mere "education records" that were available to the university's attorneys as "school officials" under FERPA, 20 USC § 1232g (2013) and 34 CFR § 99.3 (2012). We reject the argument without discussion.

petitioner to disclose the student's patient file to the attorneys defending the university. Petitioner argues that the letter sufficed as the student's consent because the letter ended with a statement that university attorneys "should instruct all university employees, including 'key players,' to '*produce*' electronic copies of their relevant active files and make sure that all back-up materials are identified and stored in a safe place." (Emphasis added.)

The board concluded, however, that the litigation-hold letter did not constitute "*the type of express consent for disclosure* identified in [Standard] 4.05(a)." (Emphasis added.) Standard 4.05(a) provides, in relevant part, that "[p]sychologists may disclose confidential information with the appropriate consent of the *** patient." The board read Standard 4.05(a) to require "express consent." Coincidentally, university policy established a parallel requirement for written authorization to release a patient's file.

Petitioner does not contend that the board erred in its construction of Standard 4.05(a), and, on review, we consider the board's interpretation of its own standard to be plausible and, hence, permissible. *See Don't Waste Oregon Comm.*, 320 Or at 142 (standard regarding agency interpretation of own rule). That is, the kind of "express consent" that the board evidently understood Standard 4.05(a) to require was consent by which a patient's purported release speaks explicitly about her patient records and expresses her intent to forgo confidentiality.

The record here permitted the board to determine that the thrust of the litigation-hold letter was to put the university on notice to *preserve* its records that relate to the claim of sexual assault. The letter was written in August 2014, a good number of months before the student's legal action and well before the student's lawyer could demand that records be "produced" in litigation discovery to him. Because the student had already received a copy for herself of her file, the word "produce," in the sense of producing documents to another party, had no application. Critically, the letter did not mention the patient file at all, nor did it identify the Center as one of the "key players" in the controversy.

Nothing in the letter asked that records be produced to university counsel. Nothing spoke of confidentiality, and nothing suggested that the student waived the confidentiality attendant to her patient file. On that record, the board did not err in concluding that the litigation-hold letter did not constitute express consent from the student to produce, deliver, or disclose her patient records to the university's attorneys within the meaning of Standard 4.05(a).

## 2. *Required disclosure?*

Alternatively, petitioner argues that her "production was required by law," due to the litigation-hold letter. Referring to the same federal case cited in Clune's letter, petitioner contends that her delivery of the patient file was required "[t]o comply with the University's legal duties under the *Zubulake* line of cases." Assuming that to be true, petitioner argues that a legal requirement to disclose is an exception to the rule of confidentiality. She notes that Standard 4.01 states that psychologists have a "primary obligation" to protect confidentiality, but the statement is qualified, adding that a psychologist "recogniz[es] that the extent and limits of confidentiality may be regulated by law." Similarly, she notes that Standard 4.05(a) provides a psychologist may disclose confidential information without consent "as mandated by law." Petitioner concludes that, because the law "requires" disclosure, she could disclose the patient file without consent under Standard 4.01 and 4.05(a).

We are unpersuaded that the "law" surrounding a litigation-hold "requires" disclosure. To explain, we begin with the nature of a litigation-hold. A litigation hold is a responsibility for the preservation of documents in anticipation of future or pending litigation. The point is that it is a matter of prudent *practice*, not a mandate expressed in law like a statute, administrative regulation, or Oregon court rule. Prompt preservation of documents is prudent because it serves parties' mutual interest in preserving evidence to establish both claims or defenses with greater certainty. In Oregon state courts, preservation might be prudent because it avoids the risk of becoming the test case to establish the contours of an arguable or potential common law claim of

spoliation of evidence. *See Classen v. Arete NW, LLC*, 254 Or App 216, 294 P3d 520 (2012) (rejecting spoliation claim without underlying claim).[11] When litigation is imminent, preservation is prudent because it avoids the risk of sanctions for violation of discovery obligations. *See* ORCP 46 (if a party fails to obey a discovery order, the court may deem related facts uncontested, strike pleadings, find a party in contempt, or order payment of costs or attorney fees); *but see Markstrom v. Guard Publishing Co.*, 294 Or App 338, 342-44, 431 P3d 443 (2018), *rev den*, 364 Or 849 (2019) (reversing dismissal as sanction for plaintiff's spoliation of evidence).

In federal practice, the need for preservation, to avoid spoliation or sanctions, is better established. In federal court, a party may be subject to sanctions, particularly dispositive sanctions, if it committed willful spoliation of evidence. *Leon v. IDX Sys. Corp.*, 464 F3d 954, 958-59 (9th Cir 2006). "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *In re Napster, Inc. Copyright Litigation*, 462 F Supp 2d 1060, 1067 (ND Cal 2006). A federal district court explained:

> "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis. The

---

[11] In *Classen*, 254 Or App at 221-22, it was unnecessary to decide the contours of a potential claim for spoliation of evidence in Oregon, but we observed:

> "The parties vehemently dispute whether, or to what extent, a claim for spoliation of evidence is cognizable under Oregon law. *Compare Boden v. Ford Motor Co.,* 86 Or App 465, 739 P2d 1067 (1987) (reversing ORCP 21 A(8) dismissal of claim for economic damages, for diminished value of product liability claim, resulting from third party's negligent destruction spoliation of allegedly defective part; concluding that such a claim was cognizable under the foreseeability principles of *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 734 P2d 1326 (1987)), *with Simpkins v. Connor,* 210 Or App 224, 150 P3d 417 (2006) (disavowing *Boden*'s foreseeability-based analysis as a basis for recovery of purely economic damages but reversing ORCP 21 A(8) dismissal of the plaintiff's claim that, because of the defendant's negligence in failing to timely produce certain medical records, violating a statutory duty prescribed under former ORS 192.525(2), the plaintiff was deprived of the ability to pursue a medical malpractice or wrongful death claim against the defendant)."

authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers."

*Zubulake v. UBS Warburg LLC*, 229 FRD 422, 430 (SDNY 2004) (*Zubulake V*) (internal quotation marks and footnotes omitted).

In *Zubulake V*, the district court observed that, a party and its attorney have a "duty to retain * * * and to produce information responsive to the opposing party's requests." *Id*. at 432-33. To that end, the court offered advice that a party's attorney should alert "key players" within its organization and instruct them "to produce electronic copies of their relevant active files." *Id.* at 434; *see also Zubulake v. UBS Warburg LLC*, 220 FRD 212 (SDNY 2003) (*Zubulake IV*) (ordering sanctions against a party for violating its duty to preserve evidence). Unique to the federal scheme, the federal rules address the pretrial need to preserve electronic data and the sanctions that may result for failure to preserve such evidence. FRCP 37(e).[12] Oregon's rules of procedure have no similar, specific requirement as to electronic data.[13]

Regardless how the loss of evidence is viewed—whether as an arguable spoliation "claim" or a risk of procedural sanctions—the preservation of evidence, in response to a litigation-hold notice, is a prudent *practice* designed to avoid unhappy legal consequences. A prudent practice is

---

[12] FRCP 37(e) provides:

"If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

"(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

"(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

"(A) presume that the lost information was unfavorable to the party;

"(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

"(C) dismiss the action or enter a default judgment."

[13] The student's patient file was maintained in electronic form at the Center. The student's action was filed in state court.

not itself "law" as that term appears to be used in Standards 4.01 and 4.05(b). More particularly, nothing about the litigation-hold practice addresses a patient's right of confidentiality. Standard 4.01 acknowledges that a psychologist will recognize that the "limits of confidentiality may be *regulated* by law," and Standard 4.05(b) acknowledges the prospect that a psychologist may disclose confidential information without consent when "*mandated* by law." (Emphases added.) However, a litigation hold is not a "limit" on confidentiality and does not "mandate" the release of confidential information. The purposes of a litigation hold could be achieved, as petitioner testified had been done in other situations in the past, by retention of a patient file on site at the Center. In short, the litigation-hold letter did not "require" disclosure by delivery to the university's attorneys.

3. *Waiver of confidentiality?*

Petitioner also argues that the student's patient records were no longer confidential because, during mediation before the filing of the legal action, the student's attorney shared some of the records with the university's attorneys as an indication of damages. Petitioner contends that confidentiality was waived. On this point, petitioner refers to the patient-psychotherapist privilege under OEC 504, and waiver under OEC 511. We consider petitioner's argument, assuming, without deciding, its unspoken premise that waiver as to the evidentiary privilege and waiver as to the ethics standards are essentially the same. Petitioner has not urged a distinction or different analysis.

We reject petitioner's argument, as did the board. In relevant part, OEC 511 provides:

"A person upon whom ORS 40.225 to 40.295 confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication."

In this case, the material part of OEC 511 is the last sentence. As we explained in *State v. Bassine*, 188 Or App 228, 233, 71 P3d 72 (2003), in holding that a privilege was not

waived, "[v]oluntary disclosure of privileged material does not waive the privilege if the disclosure is itself privileged." With exceptions not applicable here, mediation communications are privileged. ORS 36.220(1)(a) ("Mediation communications are confidential and may not be disclosed to any other person.").

Because the student had not yet filed her legal action, the university was not yet permitted to request medical or psychological records. *See* ORCP 55 D (procedure for subpoena for obtaining confidential health information in an action); *see also Nielson v. Bryson*, 257 Or 179, 477 P2d 714 (1970) (after plaintiff filed action, defendants could seek medical records but could not compel testimony of plaintiff's physicians). Park acknowledged that state of affairs in his testimony. Because the patient file was not yet subject to discovery, the patient file remained part of the confidential mediation communications. *See* ORS 36.220(3) ("[D]ocuments and other materials, *otherwise subject to discovery*, that were not prepared specifically for use in a mediation, are not confidential." (Emphasis added.)). Because the patient file was a confidential mediation communication, its partial disclosure in mediation did not waive its privilege under OEC 511. Therefore, the patient file remained confidential when petitioner delivered it to the university's attorneys.

## C.  *Substantial Evidence of Inadequate Response*

In her third assignment of error, petitioner asserts that the board lacked substantial evidence and substantial reason with which to conclude that she had not complied with Standards 1.02 and 1.03 by raising ethical concerns and taking steps to resolve them when the university's attorneys requested that she deliver the patient file. Those standards require, when a psychologist's ethical responsibilities conflict with "governing legal authority" or "the demands of an organization with which [she is] affiliated," that she "clarify the nature of the conflict, make known [her] commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the [Ethics Code]."

On that issue, petitioner challenges the board's finding of fact. Petitioner stresses that she and Park both

testified that she asked why university attorneys sought the records and whether that was necessary in light of the facts that university attorneys had seen them and the student's lawyer already possessed them. She said that, in the past, the "expectation was to hold and preserve in place" at the Center. Park recalled that she was "hesitant to send the documents over and [was] pushing back." Park said that he "preempted" her concerns about confidentiality that she had expressed in past conversations; he told her that delivery of the file was necessary for preservation purposes, was appropriate due the letter's direction to "produce" documents, and was permitted by waiver of confidentiality upon disclosure of some of the records in mediation.[14]

On the other hand, the board heard petitioner testify that she did not explicitly express an ethical concern about delivering the file, and Park concurred that he could not recall petitioner mentioning her ethical responsibilities for confidentiality. The board found that petitioner knew the student had not signed a written release for disclosure of her records, and she admitted that she did not seek to contact the student for consent before delivering the file to the university's attorneys. The board noted that petitioner knew that her employer was facing a prospective legal action from the student and that the university's attorneys' primary concerns would be defending the action and avoiding sanctions for loss of evidence. Petitioner knew that mediation had failed. Under those circumstances, the board reasoned that petitioner should have recognized an apparent conflict between confidentiality and the demands of her employer or the law as Park described it to her.

As noted, Standards 1.02 and 1.03 required petitioner to clarify the nature of the conflict, make known her commitment to confidentiality, and take reasonable steps to resolve the conflict. With those standards in mind, Younggren, a clinical psychologist, professor, and ethics expert testified that those standards obligated petitioner to

---

[14] Petitioner argues that Park assured her that the records would continue to be protected from others by federal law protecting student records from disclosure, but that assurance does not address the question about disclosure by delivery of the file to the university's attorneys themselves.

have asserted the student's privacy rights, to have objected to delivery of the patient file without consent, to have sought independent advice, and to have taken steps to secure the student's consent to disclosure. On behalf of petitioner, Thomas testified that petitioner satisfied her ethical obligations. The board agreed with Younggren, concluding that the failure to have done more violated Standards 1.02, 1.03, 4.01, and 4.05(a).

On review, our task is not to review the evidence anew as if we were the factfinders. *See* ORS 183.482(7) ("[T]he court shall not substitute its judgment for that of the agency as to any issue of fact."). As noted, our task is to determine whether the record contains substantial evidence to have permitted the board's conclusion and substantial reason to have connected the facts with the conclusions reached. *Osuna-Bonilla*, 282 Or App at 261; *Roadhouse*, 283 Or App at 865-66. We conclude that the record contains substantial evidence and the order reflects substantial reason to support the board's conclusion that petitioner failed to satisfy the professional standards of confidentiality protecting a patient's records.

D.  *Weighing Opinion Testimony*

In her fourth assignment of error, petitioner challenges the board's disregard of a lawyer who testified on petitioner's behalf that, if she had called him for advice at the time, he would have advised her to do as she did— deliver the file. Cooney testified that he is on retainer to the Oregon Psychological Association to provide advice on call to members and that he represents psychologists in proceedings before the board. He opined that the litigation-hold letter indicated that petitioner was to produce records to the university's attorneys and that she could legitimately take the records to university counsel for a litigation hold.[15]

In its initial order, the board had not made mention of Cooney's testimony in its analysis. When petitioner sought reconsideration, the board added a footnote in its

---

[15] When questioned by the ALJ, Cooney allowed that a litigation-hold letter does not necessarily operate as consent to disclosure and that the law does not require an attorney to physically take possession of documents.

revised order. The footnote explained why the board had given no weight to Cooney's testimony. The board explained that "Cooney's *post hoc* analysis" about what he would have advised petitioner, if she had called at the time of the events, "is irrelevant." That is so because that petitioner had made no effort to have "taken reasonable steps" to resolve the ethical conduct by seeking independent advice.[16]

From this record, we conclude that the board's order expresses substantial reason. Petitioner's stresses the content of Cooney's advice, as if to suggest that calling for ethics advice would have made no difference. That appears to be an argument about "harmless error" in failing to seek advice. Harmless error, however, is something that is better suited to questions of causation or procedural error.

The board's point was something more immediate and grounded in professional responsibility. Standards 1.02 and 1.03 required petitioner to make known the threat to patient confidentiality, to express adherence to the Ethics Code, to clarify the problem, and to take steps to resolve it. Petitioner testified that she did not rely on Park for ethics advice. Seeking independent ethics advice would have been one of several ways that petitioner could have shown adherence to the Ethics Code and could have taken steps to resolve the problem even if—or especially if—the advice received would have supported her action. The board's point was that she did not *try*. Whether or not we would weigh Cooney's testimony in the same way, the board's revised order did express substantial reason and was consistent with the purpose of Standards 1.02 and 1.03—that a psychologist must be proactive or otherwise demonstrate an effort to protect a patient's confidentiality.

---

[16] Petitioner challenged the board's treatment of Cooney's testimony both as a matter of law and substantial reason. Petitioner's legal challenge focuses on the board's use of the word "irrelevant" as if the board had meant "inadmissible." Irrelevant evidence may be excluded. *See* ORS 183.450(1) ("Irrelevant, immaterial or unduly repetitious evidence shall be excluded but erroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party."). However, the board's order went on to explain that Cooney's testimony was not persuasive because it did not relate to the problem that the board recognized. Accordingly, the board gave Cooney's testimony little weight. That is a question of substantial reason, not a question of law.

        The surrounding circumstances support the board's conclusion. The board found that petitioner had not expressed objections aloud so as to protect the confidentiality of the patient file, had not demanded a "clear directive from General Counsel to release the records" or a court order compelling disclosure, and, most obviously, had not contacted the student to ask her consent or secure a written release of her file. In all, we conclude that the board's conclusion, including its assessment of opinion testimony of the several expert witnesses, is supported by substantial evidence and substantial reason.

### E.   *Petitioner's Procedural Objection*

        As her fifth assignment, petitioner contends that the board erred in rejecting her "affirmative defense" that Berry, a board investigator, breached the confidentiality of the investigation contrary to ORS 676.175. Petitioner complains that, on April 15, 2015, Berry emailed Morlok, the student's counselor and a witness in the investigation. Berry's email reported, without mentioning petitioner by name, that "each psychologist" had been sent a "30-day letter" seeking responses, and that the board would consider them at its next meeting on May 22, 2015, a little over a month later. The email advised that the board could continue the investigation, dismiss it, or propose disciplinary action. The email ended by inviting Morlok to submit additional information at any time. Petitioner complains that the decision to have issued a 30-day letter was thereafter reported in *The Oregonian*, "tarring [petitioner's] reputation." Petitioner contends that the board's order should be set aside, and, indeed, dismissed, because the process was "tainted."

        Procedurally, petitioner's argument relies upon ORS 183.482(7) which provides, in material part:

> "In the case of disputed allegations of irregularities in procedure before the agency not shown in the record which, if proved, would warrant reversal or remand, the Court of Appeals may refer the allegations to a master appointed by the court to take evidence and make findings of fact upon them. The court shall remand the order for further agency action if the court finds that either the *fairness of the proceedings* or the *correctness of the action may have*

*been impaired by a material error* in procedure or a failure to follow prescribed procedure \*\*\*."

(Emphases added.) That statute "is designed to supplement the agency record regarding irregularities in procedure before the agency that do not appear in the record." *Oregon Health Care Assn. v. Health Div.*, 329 Or 480, 491, 992 P2d 434 (1999).

Substantively, petitioner relies upon ORS 676.175, which provides, in material part:

"(1)   A health professional regulatory board shall keep confidential and not disclose to the public any *information obtained by the board* as part of an investigation of a licensee or applicant, including complaints concerning licensee or applicant conduct and information permitting the identification of complainants, licensees or applicants. However, the board may disclose information obtained in the course of an investigation of a licensee or applicant to the extent necessary to conduct a full and proper investigation.

"\* \* \* \* \*

"(5)(a)   A health professional regulatory board shall disclose:

"(A)   A notice of intent to impose a disciplinary sanction against a licensee or applicant that has been issued by vote of the board;

"(B)   A final order that results from the board's notice of intent to impose a disciplinary sanction; [and]

"\* \* \* \* \*

"(E)   Information to further an investigation into board conduct under ORS 192.685."

(Emphasis added.)

Petitioner's arguments do not satisfy the standards set out in those statutes. Although petitioner has relied on ORS 183.482(7), which allows a record to be supplemented, *Oregon Health Care Assn.*, 329 Or at 491, the record has not been supplemented, nor "findings" made, to reveal "irregularities in procedure." As it is, the record does not support the critical parts of her allegations. Petitioner does not point to any evidence that counselor Morlok was the source of the

news story in *The Oregonian* that happened several weeks later. The news story contains information from other documents—information that Berry's email to Morlok does not contain—that the board had met *previously* on a particular date, March 20, 2015, and voted to issue the 30-day letters.[17]

Further, the information about which petitioner complains—the *status* of the proceedings at the time—is not "information *obtained by the board* as part of an investigation of a licensee"; it is not substantive information "obtained" by investigators about a licensee's conduct under investigation. The email only contained procedural information and was sent in response to an inquiry from a witness.

Finally, petitioner points to no evidence to indicate that disclosure to witness Morlok, who knew that an investigation had been initiated, of the fact that 30-day letters had been sent was a "material error" that actually impaired the "fairness of the proceedings or the correctness of the action." ORS 183.482(7). The results of the board's decision to charge and discipline is permitted to be reported publicly. ORS 676.175(5)(a)(A), (B). In the meantime, the board itself was necessarily aware of its proceedings. Petitioner has not contended that Berry's email to Morlok influenced the board's evaluation of the allegations of petitioner's violations of ethics standards. In short, petitioner's complaint about an investigator's disclosure was not an "affirmative defense" to petitioner's disclosure.

## IV.   CONCLUSION

For all of those reasons, we conclude that the board did not err, as a matter of law, substantial evidence, or substantial reason, when it concluded that, in delivering the patient file without consent, petitioner violated Standards 1.02, 1.03, 4.01, and 4.05.

Affirmed.

---

[17] The news story reported:

"The Board of Psychologist Examiners received initial investigation results during a confidential meeting *March 20*, and voted to investigate further, *according to documents obtained by the Oregonian/OregonLive*. The board is sending written questions to the four psychologists that must be answered within 30 days."

(Emphases added.)